FRED DEARTH, DBA DEARTH CONSTRUCTION, APPELLANT, v. ROBERT ROBINSON, RESPONDENT.

No. 4712

May 25, 1964                    392 P.2d 512

*Paul L. Larsen,* of Las Vegas, for Appellant.

*John Spann,* of Las Vegas, for Respondent.

## OPINION

By the Court, BADT, C. J.:

Appellant's theory is that this appeal presents this single, simple issue involving relationships between an owner, a general contractor, and a subcontractor, namely: Absent any agreement by the subcontractor (here the lien claimant and appellant) receiving payment from the general contractor that he will apply the same to a particular owner's account, and absent any knowledge by the subcontractor of the source of payment made to the general contractor, the subcontractor may apply the payment received by him to his general account with the general contractor, and may sue and recover against the landowner for the labor and materials furnished, as reflected by his business records of account. Appellant lien claimant asserts that the violation by the court below of such well-recognized rule in entering judgment in favor of the landowner requires a reversal.

However, the confusing facts disclosed by the record and the absence of proof as disclosed by the record fail to present a factual situation into which the asserted principle of law can be made to fit.

Appellant's original complaint in the court below named as defendants Robert Robinson (respondent here) and also William Elwell, Walter Shaner and his wife, and Gerald Swaney and his wife for the foreclosure of separate labor and material liens upon separate parcels of

property owned, respectively, by the first parties.[1] The learned trial judge stated in the beginning of his written decision "that all claims of the plaintiff against the defendants, save and except that [against] Robert Robinson, were settled prior to trial." All parties appear to accept such statement, though its basis is dehors the record. In any event, the judgment is against the plaintiff and in favor of Robinson for costs and attorney fee, and Dearth is the sole appellant from that judgment.

We proceed to the confusing situation presented by the record.

Fallout Shelters, Inc., represented by its president, one Henthorn, contracted with sundry owners, including Robinson, to do the necessary excavation work and to furnish fallout shelters to be placed therein. All the parties agree to regard Fallout as the general contractor and Dearth as subcontractor for such work, and refer to them by such designations. However, Fallout did not possess a Nevada contractor's license as required by NRS Chapter 624. It seems, however, that the state contractors' board encouraged a situation wherein Fallout could enter into contracts to supply fallout shelters but could procure licensed contractors to do the work.[2] Dearth's complaint alleges that he is a duly licensed general contractor and that he entered into a written contract *with Robinson* to furnish excavation work and equipment to perform same, and actually did furnish and deliver the necessary labor and materials to Robinson's premises, all at the special instance and request *of Robinson,* the owner, and that the balance due and owing after deducting all just credits and offsets was the sum of $793.74, all of which remained unpaid; that within 90 days after the completion of the work he had recorded his verified claim and notice of lien and served a copy on Robinson.

The asserted written contract between Dearth and Robinson was not in evidence. Dearth testified that his

---

[1] It does not appear from the record that this patent misjoinder of the parties was attacked in the trial court.

[2] This is the situation presented by the parties. No member or agent of the state contractor's board was called to explain or discuss the situation.

agreement "was to get paid every week from Henthorn," and that such agreement had been made *with Henthorn.* This involved the excavation of a number of fallout shelters, not only for the additional three sets of defendants mentioned in the original complaint but later dropped, but for sundry persons in addition. For a time Henthorn made the weekly payments as agreed, upon the submission by Dearth of his billings.

Apparently, however, he became extended financially and started falling behind on the weekly payments. Henthorn had been obtaining the money from the sundry owners with which to make the payments, but Dearth had no knowledge of the source of these moneys.

Mrs. Dearth kept the books for her husband. The only records which she kept, and from which she testified were the time cards submitted by the laborers and checked and approved by Mr. or Mrs. Dearth, together with a list of the laborers showing the nature of their work, the equipment used and the hours worked, together with a single yellow sheet showing when the work started and when it stopped on the Swaney, Lecker, Jenks, Elwell, Shaner, and Robinson jobs, with the charges, payments, and extended balances.

On each of these jobs the recorded notice of lien was introduced in evidence. In each of said liens, including the Robinson lien, it is stated that all the materials were furnished pursuant to the contract with the owner "and authorization from said owner and Fallout Shelters, Inc." She referred to the yellow sheet as her breakdown on six jobs for Fallout Shelters, including the Robinson job. As to the payments made by Henthorn, she testified that Henthorn paid $560 on December 27 "which was for past billing. That is all. He paid us 12/15/[61] credited to Doctor Lockwood for $863.00 that time and he had a balance then of $3,799.26. * * * He gave us a check for a thousand dollars, December 1st, [1961] * * * and then he gave us a petty check for $125.00. * * * We were billed for this work that was done which would possibly be partially on one job and partially on another job * * *. He did not designate any job he was paying for. He was just paying partial billings. I would deposit

the payment and it would go toward paying the payroll. * * * We took the moneys and paid it to prior billings as it came in, the first job done was paid first." The record indicated that the Robinson job and one other job had the earliest recording as to commencement of work. With the further testimony that no payments were credited to the Robinson job, the court in desperation took charge of the examination in order to find out the true situation as to how the money was applied. It simply brought out the repeated statements that the moneys paid to Dearth were "credited to the first billing."

Again and again the court sought to make sense out of the testimony. "By the Court: Now, the only other thing that bothers me is whether or not Mr. Robinson paid anything to Fallout Shelters or what contribution the Fallout Shelters made to the Plaintiff and why wasn't the money pro-rated. There must be some correlation here. This is the only explanation I would like would be why wasn't the money that was paid by Mr. Robinson to Fallout and by Fallout, pro-rated to these jobs?"

The only answer was that the first billings were the first credited, "first in, first paid." But the billings were in weekly billings for the labor as it was performed, and no work antedated that of the Robinson job. Counsel for Dearth stated to the court: "We could go more particularly into that in proving, if your Honor, please." The court indicated that such was the proof it wanted, but it was never forthcoming. Plaintiff's counsel insisted that there was no duty to pro-rate, to which the court replied: "That's something you're going to have to show me. That could be a legal question. It would be true on an open account but here you're claiming lien rights and it may be that the Defendant here is entitled to some benefits from what he's paid here and especially from what Henthorn paid out of the moneys that Robinson gave him."

When Dearth, on cross-examination, admitted that he had no agreement as to price with Robinson, plaintiff asked leave to amend his complaint to conform to the

evidence to the effect that Dearth contracted "with Fallout Shelters, Inc., as agent for defendant Robert Robinson." The court said that this did not concern it, as the owner would still be bound to pay the subcontractor and that "[t]he only thing that distresses me is the method of accounting. That's all that bothers me, the method of accounting. At this point the evidence would show that Dearth performed services for the reasonable value of $793.74. The only question is, did he receive any money for it. That to me is the problem  *  *  *."

Plaintiff closed his case without ever resolving this problem. Defendant called Henthorn, president of Fallout Shelters, Inc., who produced a billing dated November 30, 1961, and stated that there were quite a few billings prior to November 30, 1961. Again it must be remembered that the Robinson job was started November 11, 1961.

Robinson had on November 24, 1961, made a payment to Henthorn of $1,125.00. Henthorn had on November 28 made a payment to Dearth of $200.00, and on December 1, 1961, $1,000.00. The entire balance unpaid by Henthorn to Dearth amounted to several thousand dollars. Dearth insisted that the entire balance due on the Robinson job was $793.74, and filed his lien claiming such sum.

With Dearth's insistence that no sums were paid on the Robinson job as contrasted with Mrs. Dearth's statements and Dearth's statements that all payments were credited to prior billings, and with the evidence that no jobs antedated the Robinson billings, with no proof that Henthorn in making payments indicated to which account they were to be credited, and with no showing that Dearth had made any particular allocation outside of the claim that the payments were devoted to the "first billings," and in the light of a complete lack of showing by Dearth as to any definite records on the point, full support is found for the following statement in the court's decision: "It cannot be said that the money that the defendant Robinson gave to the general contractor was not paid to the plaintiff upon at least a portion of

the work that was done by the plaintiff for the defendant. It seems axiomatic to the Court that meticulous books should be kept to determine what jobs were paid for and what jobs were not. In other words, one cannot say that because he has done work on ten properties for a general contractor, that the general contractor is indebted to him for 'x' dollars; that being the balance of the money owed for all of the work performed and then say because there is a balance due, he will charge his lien to one of the parties." In other words, the court was simply saying that Dearth had not made out a case. With this we agree. We can perceive no undue hardship upon lien claimants by requiring them to keep appropriate records in support of their claims of lien.

This being so, it is unnecessary to discuss situations whereunder a creditor applies a payment to a particular account where the debtor making the payment does not specify to which account it must be applied. See Bailey v. Neagle, 54 Nev. 257, 13 P.2d 634. Nor under the lack of proof as noted above was the court required to make application to the oldest debt. See Biel v. Godwin, 69 Nev. 189, 245 P.2d 997. Nor need we discuss the division of authority as to Robinson's right, in his payments to Fallout, to control the application of payments made by Fallout to Dearth. Nor need we discuss the right of Dearth to apply the funds to satisfy other debts due him from Fallout, in the absence of Dearth's knowledge of the source of the funds, as discussed in the annotations found in 41 A.L.R. 1297, 130 A.L.R. 198, and 166 A.L.R. 641. Nor is the situation altered by reason of the fact that Robinson could have protected himself by requiring a performance bond from Fallout, or by making his payments to Fallout by a joint check payable to Fallout and Dearth. The same lack of conviction found by the trial court in the presentation of the proofs is echoed in the briefs filed in this court on appeal.

The judgment is affirmed with costs.

McNAMEE and THOMPSON, JJ., concur.